## Case No. 15,164.

### UNITED STATES v. FREMONT.

[Hoff. Land Cas. 20.] [1]

District Court, N. D. California. Dec. Term, 1853. [2]

MEXICAN LAND GRANTS—SEGREGATION—SETTLEMENT ON LANDS.

1. It is a sufficient severance from the public domain, when the grant itself designates by unmistakable natural boundaries the limits of the district within which it is to be located, and where the particular land granted is specified by name.

2. The time for making a settlement on the lands granted is limited to one year. The danger from savages before and after the grant, is no excuse for not complying with that condition.

The claim was for ten square leagues of land granted to Juan B. Alvarado, and confirmed by the board of land commissioners. The United States appealed.

S. W. Inge. U. S. Dist. Atty.

V. E. Howard, Jones & Strode, and Lockwood, Tyler & Wallace, for appellee.

HOFFMAN, District Judge. This case came up on appeal from the board of commissioners for ascertaining and settling the private land claims in California, by whom the claim of the petitioner was confirmed. The title of the claimant [John C. Fremont] is derived by a mesne conveyance, the execution of which is not disputed, from Juan B. Alvarado. The original petition of Alvarado upon which the grant issued, bears date February 22, 1844, and represents that being desirous of increasing his land and contributing to the spreading of agriculture and the industry of the country, he solicits the governor, according to the colonization laws, to grant him "ten leagues of land north of the river San Joaquin within the limits of the Sierra Nevada mountains, in the same direction as the river Chowchillas on the east, that of the Merced on the west, and the before mentioned San Joaquin, with the name of the Mariposas." He also represents that he is unable to present a plan or draft of said land, because it is on the confines of the wild Indians and a wilderness country. On the twenty-ninth of February, 1844, the grant issued subject to the approval of the departmental assembly and upon the usual conditions. The land granted is thus described: "The tract of land known by the name of Mariposas, to the extent of ten square leagues, within the limits of the Sierra Nevada, and the rivers known by the names of the Chowchillas, of the Merced, and the San Joaquin." The approval of the departmental assembly was not obtained, nor does the grant appear to have been submitted to that body. The genuineness of the grant is not disputed.

1 [Reported by Numa Hubert, Esq., and here reprinted by permission.]

2 [Reversed in 17 How. (58 U. S.) 542.]

Among the conditions of the grant are the following: "(3) He shall solicit from the proper magistrate the juridical possession of the same, by virtue of this title, by whom the boundaries shall be marked: on the limits of which he (the grantee) shall place the proper landmarks." "(5) The tract of land granted is ten square leagues as before mentioned. The magistrate who may give the possession shall cause the same to be surveyed according to the ordinance, the surplus remaining to the nation for the proper purposes." No juridical possession was ever given by the magistrate, nor was the land surveyed during the existence of the former government.

It is objected by the district attorney that the claim cannot be confirmed, because the land was not segregated from the public domain before the change of sovereignties. But upon the assumption that the cases decided under the act of 1824 [4 Stat. 52] apply to the case now under consideration. the inquiry presents itself whether, under the rules of decision laid down by the supreme court, this claim must be rejected for vagueness of boundaries. The land is described in the grant as "the tract known by the name of the Mariposas, to the extent of ten square leagues, within the limits of the Sierra Nevada and the rivers Chowchillas, Merced and San Joaquin." The district of the country embraced by these exterior boundaries is shown to contain nearly one hundred square leagues. If the grant contained no other means of designating on what part of this extensive district the particular ten leagues granted were to be taken, I should strongly incline to the opinion that, under the decisions of the supreme court, it would be void for uncertainty. But the tract granted is called in the grant, "Las Mariposas." If, then, within the general exterior limits a particular tract by the name of "Mariposas" can be found and identified, that tract must be taken to be the subject of the grant. From the testimony taken, it appears that within the general limits mentioned in the grant a smaller tract, situated on the Mariposas creek, is well known. and seems to have been understood to be the tract granted to Alvarado. This tract, joining the valley of the Mariposas. is that delineated on the map of Pico, which. though merely a private map, and made from memory. yet when accompanied by a survey by the surveyor general, made in conformity with it, and taken in connection with the testimony, shows that there is a tract of land known as Las Mariposas, situated within the general limits of the grant, and capable of identification. The valley seems to be easily distinguishable, being narrow and shut in by high and barren hills. This, Gen. Vallejo swears to be the tract generally known to have been granted to Alvarado. In O'Hara's Case, 15 Pet. [40 U. S.] 283, the court say: "The place where the survey is to be made, must first be made certain; if not as to fixed boundaries, at least so certainly by evidence of general or popular apprehension, as to show what was the grantor's notion of the limits of country within which he intended to grant." In this case, not only are the general limits of the country specifically shown by the exterior boundaries mentioned in the grant, but the particular part is designated. In the case of U. S. v. Clarke, 8 Pet. [33 U. S.] 467, the grant was for "five miles square of land on the west side of St. John's river, above Black creek, at a place called White Spring," and this the supreme court held valid as to the whole land within its limits, as well that which had not been surveyed, as the 8,000 acres which had. I do not perceive that the description in that grant was more specific than that under consideration. In Boisdoré's Case, 11 How. [52 U. S.] 86, the claim was rejected for a vagueness of description. but in that case the quantity of land was not designated. and the uncertainty of the boundaries left it liable to be enlarged or diminished at the discretion of the surveyors.

In the case at bar, the quantity of land granted is fixed. The limits of the district within which it is to be located. are designated by unmistakable natural boundaries, and the particular land granted is specified by name. It does not seem to me that in directing a survey to be made in the valley of the Mariposas, or in adopting that already made, the court would be exercising the granting power, but rather be determining the extent and locality of land already severed from the public domain by the grant itself.

The other objection urged by the district attorney to the confirmation of this claim is, that the conditions of the grant have not been complied with, and therefore the title of the claimant being inchoate or imperfect, not having been approved by the departmental assembly, no equitable obligation rests upon the United States to perfect it. In the Case of Cervantes [Case No. 14,768] it was considered by this court. that the only solid equity which the claimant under an unconfirmed grant could urge upon the government was the fulfillment of the conditions, or the performance of those acts which, under the Mexican system. were the only motives and considerations for the grant—and that where as in that case the conditions had been wholly unperformed, and the grant apparently abandoned for a great number of years, without an effort or an excuse, the claimant could not appeal to the justice of the government to confirm his claim, however much his application might commend itself to its generosity. In the Case of Reading [Id. 16,127] the efforts of the plaintiff to perform, and his excuses for his failure to perform completely, were deemed sufficient to entitle him to a confirmation within the rule laid down in Sibbald's Case [10 Pet. (35 U. S.) 313]. to which it seemed most analogous. The facts in the case at bar are as follows: The grant was issued to Alvarado on the twenty-ninth

of February, 1844, on condition, among other things, that "he should build a house within a year, and that it should be inhabited." Immediately on receiving his grant, Alvarado (as appears from his own testimony) applied to the governor for a military force to enable him to take possession, reminding him of the fact already known to him, that the country was infested with hostile Indians, and could not be occupied except with the aid of a military force. The governor, as Alvarado testifies, offered to erase the conditions from the grant, but this the petitioner declined, alleging his desire and intention to occupy and cultivate his land. The governor then agreed to furnish the necessary force, and a military post was soon after established on the San Joaquin, near the granted land. Owing to the depredations of the Indians, this post was after a short time abandoned. Shortly after there was a political revolution, and Gen. Micheltorena's affairs becoming embarrassed, no more troops were sent. This occurred during the year 1844. Alvarado further testifies, that in August, 1845, while commander at Monterey, he collected the cavalry and took them to his rancho, near Monterey, and was organizing them for the purpose of taking possession, by their aid, of the Mariposas. While thus engaged, he received orders from Gen. Castro to return to Monterey, there being rumors of war. From that time Alvarado made no other attempts to take possession—his military duties occupying all his attention during the war which immediately ensued. In the beginning of 1846 the war between the United States and Mexico broke out, and on the seventh of July of that year, the American flag was hoisted and the Mexican authorities deposed. On the fourteenth of February, 1847, Alvarado conveyed to Fremont, the present claimant. On receiving his conveyance, Fremont seems to have taken some measures to settle and cultivate his land, but being ordered home under arrest, he employed an agent to go upon the land, and cultivate and inhabit it. That agent was, by Fremont's direction, supplied with money, agricultural implements, provisions, etc.; but on going to the land in the spring of 1847, found the Indians so hostile that he was obliged to abandon the enterprise. The same agent twice visited the land during the following summer, but found the Indians so hostile that he was unable to make any settlement. The land was not finally settled until after Fremont's return from the United States in 1849. But since that time, the claimant has erected upon it numerous valuable improvements—consisting of dwelling houses, farm houses, machine shops, etc., and is now in possession of the tract. The whole testimony leaves no room to doubt but that the settlement was effected at as early a time as the hostility of the Indians, and the circumstances of the country rendered it practicable to do so without a large military force.

It is urged by the district attorney that hostility of the Indians affords no excuse for nonfulfillment of the condition, and in support of this position, the case of De Villemont v. U. S., 13 How. [54 U. S.] 266, is relied on. The Case of De Villemont bears the strongest analogy to the one under consideration. The concession was granted in consideration of the petitioner's intention and promise to establish a stock farm and plantation. It was made under the express condition that he should make the regular road and clearing, within the peremptory term of one year, the concession to be null if at the precise expiration of three years the farm should not be established. From the date of the grant, until the delivery of Louisiana to the United States, he had completely failed to comply with the conditions. In excuse, he showed that during all that time he was the civil and military commandant of the fort of Arkansas; that his presence there was constantly required by the threatening aspect of the Indian tribes by whom he was surrounded; and his correspondence with the governor showed that even a temporary absence from his post would not have been tolerated. He further showed that the hostility of the Indians prevented a settlement by his agents. It was also established by proof, that the common usage of the Spanish authorities was to insert the conditions, as to making a settlement and a road within a given time, mechanically, and as mere matter of form; that no land was ever forfeited under the Spanish government for noncompliance with these conditions; and the testimony on this point was confirmed by that of a judge of the supreme court of Louisiana, of great experience and reputation. It further appeared, that the claimant had, as in this case, attempted to make a settlement by an agent, but the hostility of the Indians prevented it. It is apparent that in almost every particular that case resembles the one now under consideration.

The court, in commenting on the duty of performing the conditions, say: "It was undoubtedly necessary that an establishment should have been made within three years—such being the requirements of the grant in concurrence with the regulations." The evidence of usage in that case was at least as strong as that relied on in this; and the attempt to settle seems to have been made in that case as in this, and to have been abortive for the same reason. The court was also in that case required to be governed in its decisions by the laws, usages, and customs of the government under which the claim originated. But the claim was rejected, notwithstanding the excuses offered, and the evidence of the uniform usage of the Spanish authorities. Boisdoré's Case is, if possible, stronger; for in that case there was a partial performance of the conditions; but the court held that inasmuch as the claimant had stipulated to remove his family to the land, and take there all his force of negroes, the occu-

pation by a single mulatto, by whom some cattle were kept, and a few acres cleared, was wholly insufficient. With respect to the excuse that the state of the country and Indian hostilities prevented the settlement, the supreme court held as early as Kingsley's Case, 12 Pet. [37 U. S.] 483, that the excuse could not be received, if the same obstacles existed at the time of the concession; and the decision in De Villemont's Case but reaffirmed that doctrine. The Case of Sibbald, 10 Pet. [35 U. S.] 313, is relied on by the counsel for the claimant, as furnishing an instance analogous to that in this case, of a good performance cy prés. But the difference between the cases is obvious. The grant in that case was on condition that a mill should be established; and it declared, that until the petitioner should establish his mill, this grant should be of no effect. It was dated in 1816, but no specific time was limited by the decree within which the mill was to be erected and put in operation. It appeared that a mill was built in 1819, and carried away by a freshet, but that $5,000 had been expended in the construction; that in 1827, another mill was built and in operation, which was destroyed by fire in 1828; that in October of 1828, another was built, which went into operation in June, 1829, and had ever since so continued. The court held that the petitioner had begun the erection of the first mill in time to save a forfeiture, and that the other acts amounted to a compliance with the condition, according to the rules of equity.

But in the case at bar, the time for making the settlement is limited to one year. So far as appears, Alvarado never saw the tract he assumed to convey to Fremont; nor was any settlement effected by the latter until a year after the ratification of the treaty. It cannot be urged in this as in other cases, that the grant was not made complete by the assent of the assembly, owing to accident, or the neglect of the governor, for Alvarado himself says it could not be submitted to them without the diseño or plan, which on account of the hostilities of the Indians he was unable to furnish; and yet the danger from that source existed at the time of his application, for he assigns it to the governor as a reason why the diseño did not accompany the petition. It is urged that the political disturbances of the country contributed to prevent the settlement. But I think it clear from the evidence, that the principal, if not the only reason why it was not effected by Alvarado or Fremont, until after the treaty, was the danger from the savages; and that this danger existed to substantially the same degree before and after the grant.

Upon the whole, after a most careful consideration of this case, and with every desire to give the claimant the full benefit of every favorable consideration to which he is entitled, I have been unable to resist the conclusion that the Cases of Glen, of De Villemont

and of Boisdoré, lay down for me rules of decision applicable to this case, and from which I am not at liberty to depart.

[NOTE. The case was taken on appeal to the supreme court, where the decree of the district court rejecting the claim was reversed. 17 How. (58 U. S.) 542. A mandate was issued to the district court, where it was filed, and the decree entered. Case unreported. A second appeal was taken to the supreme court, which was dismissed. 18 How. (59 U. S.) 30.]